# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

|  |  |  |
|---|---|---|
| UNITED STATES ex rel. | : | |
| | : | CIVIL ACTION NO. |
| [REDACTED FOR PRIVACY], | : | _____ |
| | : | |
| *Relator-Plaintiff*, | : | SEALED UNDER 31 U.S.C. § 3730(b) |
| | : | |
| **v.** | : | |
| | : | COMPLAINT AND JURY DEMAND |
| [REDACTED]; | : | |
| [REDACTED]; AND [REDACTED]; | : | |
| | : | DO NOT PLACE IN PRESS BOXES |
| | : | |
| *Defendants.* | : | DO NOT POST ONLINE |
| | : | |
| | : | DO NOT MAKE PUBLICLY AVAILABLE |
| | : | |

## FALSE CLAIMS ACT COMPLAINT
## FILED UNDER SEAL

*Serve on United States of America care of the following:*

Prim F. Escalona
United States Attorney
Northern District of Alabama
1801 4th Avenue North
Birmingham, Alabama 35203

Merrick B. Garland
Attorney General of the United States
Department of Justice
10th & Constitution Aves. N.E.
Washington, DC 20530

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

2022 MAY -9 P 3: 25

| | | |
|---|---|---|
| **UNITED STATES ex rel.** | : | **CIVIL ACTION NO.** |
| | : | _5:22cv595-HNJ_ |
| **JOHN BROOKS,** | : | |
| | : | **SEALED UNDER 31 U.S.C. §** |
| | : | **3730(b)** |
| _Relator-Plaintiff,_ | : | |
| | : | **COMPLAINT AND JURY** |
| **v.** | : | **DEMAND** |
| | : | |
| **SYSTEMS PRODUCTS AND** | : | **DO NOT PLACE IN PRESS** |
| **SOLUTIONS, INC., MILLENNIUM** | : | **BOXES** |
| **SYSTEMS SERVICES, INC., AND** | : | |
| **NILMINI THOMPSON,** | : | **DO NOT POST ONLINE** |
| | : | |
| _Defendants._ | : | **DO NOT MAKE PUBLICLY** |
| | : | **AVAILABLE** |

## COMPLAINT

This Complaint is filed by Relator John Brooks against Defendants Systems

Products and Solutions, Inc. (SPS); Millennium Systems Services, Inc. (MSSI); and

Nilmini Thompson.

## I.    Summary of the Case

Relator John Brooks has sued in the name of the United States Government

to recover damages and civil penalties from false and fraudulent claims submitted

by the Defendants. Defendants SPS and MSSI are defense contractors. Defendant

Nilmini Thompson is the CEO of both companies. Thompson is the architect of the

schemes to defraud the Government.

In a procurement fraud scheme, Defendant MSSI submitted, and Defendant Thompson caused to be submitted, false and fraudulent claims to the U.S. Army Defense Finance and Accounting Service (DFAS) via the wide area work flow (WAWF) electronic invoice submission portal. MSSI is a contractor under the Expedited Professional and Engineering Support Services (EXPRESS) Program, based out of Redstone Arsenal in Alabama. MSSI employed, and knowingly billed for, employees that it certified had a Secret-level security clearance. MSSI submitted more than such 300 invoices. In each of those invoices, MSSI certified the security clearance of its employees, knowing they did not have security clearance. Defendants MSSI and Thompson also knowingly submitted, and caused to be submitted, invoices for subcontract labor billed at too high a rate. Both procurement fraud schemes caused American taxpayers to be overbilled for MSSI's work.

In a second scheme, Thompson or her intermediaries submitted false claims to the Small Business Administration under the Paycheck Protection Program on behalf of both MSSI and SPS. The two companies combined to obtain $3.9 million in PPP loans. There were strict rules regarding use of PPP loan proceeds, but Thompson broke those rules and used the loan proceeds to repay lines of credit at Synovus Bank and as reimbursement for personal expenses.

**[Remainder of page left blank intentionally.]**

## II.    Table of Contents

I.     Summary of the Case ............................................................... 2

II.    Table of Contents .................................................................. 4

III.   Parties .................................................................................... 5

    *A.   Relator* ............................................................................ 5

    *B.   Defendants* ...................................................................... 6

IV.    Jurisdiction and Venue ........................................................ 8

V.     Governing Law: The False Claims Act .............................. 8

VI.    Laws Governing Submission of Claims under EXPRESS ......... 9

VII.   Factual Allegations regarding EXPRESS False Claims ......... 14

    *A.   MSSI illegally billed for work performed by employees who did not have appropriate security clearances under the EXPRESS BPA.* .......... 14

    *B.   MSSI misrepresented the labor wage scale of certain employees.* ............. 17

VIII.  Laws Governing CARES Act Paycheck Protection Program Loans ..... 19

IX.    Factual Allegations regarding CARES Act Paycheck Protection Program Fraud by SPS, MSSI, and Thompson ......... 25

X.     Causes of Action .................................................................. 27

XI.    Prayer for Relief and Jury Demand .................................. 37

[Remainder of page left blank intentionally.]

## III. Parties

1.     The Relator and each of the three Defendants are described reliably in turn below.

### A. Relator

2.     Relator John Brooks is a citizen of Alabama and the United States of America. Relator brings this civil action for violations of 31 U.S.C. § 3729 *et seq.* for himself and for the United States Government under the *qui tam* provisions of the False Claims Act, 31 U.S.C. § 3730(b)(1).

3.     Brooks was an officer in the U.S. Army for more than twenty years. He is a veteran of the Gulf War (Operation Desert Shield and Operation Desert Storm) and served as staff of two Company Commands. He received the Air Medal With "V" Device for valor and the Bronze Star. Brooks honorably retired in 2006 at the rank of Lieutenant Colonel.

4.     Upon his retirement, Brooks entered the defense contracting industry, and (other than a six-month period between his termination described below and finding new employment) he was continuously employed as a defense contractor between his retirement from the Army and his departure from SPS and MSSI in December 2020.

5.     Brooks was employed by SPS and held authority for work at MSSI, as well. Brooks was hired as Vice President of Operations of both companies and was

promoted in April 2020 to the positions of COO and Vice President of both companies simultaneously.

6.      While Brooks worked for both companies, his salary was paid by SPS.

7.      Brooks worked for SPS and MSSI from approximately February 2019 to December 2020.

8.      Brooks received only positive performance reviews for his work at MSSI and SPS.

9.      At SPS and MSSI, Brooks was responsible for tracking performance under the government contracts described below, and for ensuring compliance with all relevant contract provisions.

10.     Relator's direct and independent knowledge was obtained inside SPS and MSSI where he performed many job functions that directly relate to the wrongful conduct alleged here.

### B. Defendants

11.     Defendant Systems Products and Solutions, Inc. (SPS) is an Alabama corporation with its principal office located at 307 Wynn Drive Huntsville, Alabama 35805. It has operated since approximately November 2007. On its website, SPS describes itself as a "Minority Woman-owned Small Business" that "bolsters the readiness of a Myriad of other Aviation platforms (Apache, Chinook, Blackhawk and Future Vertical Lift Concepts) and their ground support equipment by providing

life cycle logistics, repair, training, and testing support." *See* SPS, What We Do: Aviation Systems & Solutions *at* https://services-sps.com/capabilities/aviation-systems-solutions/ (last visited April 5, 2022).

12.      Defendant Millennium Systems Services, Inc. (MSSI) is an Alabama corporation with its principal office located at 430 Wynn Drive Huntsville, Alabama 35806. It has operated since approximately June 2001. MSSI describes itself on its website as a "Certified Woman-owned Small Business" that provides "a full array of Aviation services with extensive experience in defense logistics, maintenance, security assistance/foreign military sales, and professional services." *See* MSSI, About MSSI *at* http://www.mssi-inc.com/who-we-are/about-mssi/ (last visited April 5, 2022).

13.      SPS and MSSI have contracted, and continue to contract, with the U.S. Government through the EXPRESS vehicle and other contracts.

14.      Defendant Nilmini Thompson is the founder, president, and CEO of both Defendants SPS and MSSI. She assisted in creating, planning, and executing the scheme to defraud the Government described here. She instituted, planned, procured, and acted in furtherance of the schemes described here, contrary to the advice and urging of Relator Brooks. Her last known home address was 5 Asbury Road SE Huntsville, Alabama 35801.

## IV.    Jurisdiction and Venue

15.    This action arises under 31 U.S.C. § 3729 *et seq*., commonly known as the False Claims Act.

16.    This Court has jurisdiction over this action under 31 U.S.C. § 3732(a) and 28 U.S.C. § 1331, because this civil action arises under the laws of the United States and at least one of the Defendants resides and can be found in Alabama and transacts business in Alabama.

17.    Venue is proper in the Northern District of Alabama under 28 U.S.C. § 1391(b) and (c) and 31 U.S.C. § 3732(a) because at least one Defendant that operated in concert with other Defendants resides, can be found in, and operates and transacts business in the Northern District of Alabama.

18.    Relator has complied with the requirements of 31 U.S.C. § 3730(b)(2).

## V.    Governing Law: The False Claims Act

19.    The False Claims Act provides in part that certain acts are prohibited by law, and any person or corporate entity that violates the False Claims Act is liable for damages, penalties, and other relief, including exclusion from participation in Federal programs:

(a) Liability for certain acts.

(1) In general. Subject to paragraph (2), any person who—

   (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

(C) conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G);

(D) has possession, custody, or control of property or money used, or to be used, by the Government and knowingly delivers, or causes to be delivered, less than all of that money or property;

(E) is authorized to make or deliver a document certifying receipt of property used, or to be used, by the Government and, intending to defraud the Government, makes or delivers the receipt without completely knowing that the information on the receipt is true;

(F) knowingly buys, or receives as a pledge of an obligation or debt, public property from an officer or employee of the Government, or a member of the Armed Forces, who lawfully may not sell or pledge property; or

(G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government,

is liable to the United States Government for a civil penalty of not less than $5,500 and not more than $11,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104-410), plus 3 times the amount of damages which the Government sustains because of the act of that person.

31 U.S.C. § 3729.

## VI. Laws Governing Submission of Claims under EXPRESS

20. The EXPRESS contracting arrangement is conducted under a blanket purchase agreement, or BPA.

21.     A BPA is an agreement between the Government and contractors who work according to a GSA Schedule to fill recurring needs for supplies or services. GSA Fed. Acquisition Rule 8.405-3(a).

22.     The GSA believes "BPAs make it easier for the contractor and buyer to fill recurring needs with the customer's specific requirements in mind, while using the buyer's full buying power by taking advantage of quantity discounts, saving administrative time, and reducing paperwork." GSA, Blanket Purchase Agreements *at* https://www.gsa.gov/buying-selling/purchasing-programs/gsa-multiple-award-schedule/schedule-features/blanket-purchase-agreements (last visited April 5, 2022).

23.     As it pertains to this case, the EXPRESS BPA contains and incorporates two important terms.

24.     The first term is the Security Requirement located at section 5.0 of the EXPRESS Statement of Work. In pertinent part, that requires MSSI to allow only employees with at least a Secret-level security clearance to work under the contract:

> The contractor shall, in the performance of individual task orders or technical directions (TDs), be required to provide security certified personnel and facilities. The contractor, team members and subcontractors shall provide functional support services to the Security level specified in the DD Form 254 of individual task orders. Guidance above and beyond the DD Form 254 of individual task orders will be provided on a case-by-case basis.

EXPRESS Statement of Work § 5.0.

25. The second term is the labor rate and category for certain employees under the GSA Multiple Award Schedule Program.

26. Under the terms of the contract, MSSI was required to bill certain employees at a defined contract rate. They were not allowed to vary from this rate.

27. The U.S. Code requires, among other things, that contractors and subcontractors certify they have submitted accurate cost and pricing information:

(a)When Required.—The head of an executive agency shall require offerors, contractors, and subcontractors to make cost or pricing data available as follows:

(1) Offeror for prime contract.—An offeror for a prime contract under this division to be entered into using procedures other than sealed-bid procedures shall be required to submit cost or pricing data before the award of a contract if—

(A) in the case of a prime contract entered into after June 30, 2018, the price of the contract to the Federal Government is expected to exceed $2,000,000; and

(B) in the case of a prime contract entered into on or before June 30, 2018, the price of the contract to the Federal Government is expected to exceed $750,000.

(2) Contractor.—The contractor for a prime contract under this division shall be required to submit cost or pricing data before the pricing of a change or modification to the contract if—

(A) in the case of a change or modification made to a prime contract referred to in paragraph (1)(A), the price adjustment is expected to exceed $2,000,000;

(B) in the case of a change or modification made to a prime contract that was entered into on or before June 30, 2018, and that has been modified pursuant to subsection (f), the price adjustment is expected to exceed $750,000; and

(C) in the case of a change or modification not covered by subparagraph (A) or (B), the price adjustment is expected to exceed $750,000.

(3) Offeror for subcontract.—An offeror for a subcontract (at any tier) of a contract under this division shall be required to submit cost or pricing data before the award of the subcontract if the prime contractor and each higher-tier subcontractor have been required to make available cost or pricing data under this chapter and—

(A) in the case of a subcontract under a prime contract referred to in paragraph (1)(A), the price of the subcontract is expected to exceed $2,000,000;

(B) in the case of a subcontract entered into under a prime contract that was entered into on or before June 30, 2018, and that has been modified pursuant to subsection (f), the price of the subcontract is expected to exceed $2,000,000; and

(C) in the case of a subcontract not covered by subparagraph (A) or (B), the price of the subcontract is expected to exceed $750,000.

(4) Subcontractor.—The subcontractor for a subcontract covered by paragraph (3) shall be required to submit cost or pricing data before the pricing of a change or modification to the subcontract if—

(A) in the case of a change or modification to a subcontract referred to in paragraph (3)(A) or (B), the price adjustment is expected to exceed $2,000,000; and

(B) in the case of a change or modification to a subcontract referred to in paragraph (3)(C), the price adjustment is expected to exceed $750,000.

(b) Certification.—

A person required, as an offeror, contractor, or subcontractor, to submit cost or pricing data under subsection (a) (or required by the head of the procuring activity concerned to submit the data under section 3504 of this title) shall be required to certify that, to the best of the person's knowledge and belief, the cost or pricing data submitted are accurate, complete, and current.

(c) To Whom Submitted.—Cost or pricing data required to be submitted under subsection (a) (or under section 3504 of this title), and a certification required to be submitted under subsection (b), shall be submitted—

(1) in the case of a submission by a prime contractor (or an offeror for a prime contract), to the contracting officer for the contract (or a designated representative of the contracting officer); or

(2) in the case of a submission by a subcontractor (or an offeror for a subcontract), to the prime contractor.

(d) Application of Chapter.—

Except as provided under section 3503 of this title, this chapter applies to contracts entered into by the head of an executive agency on behalf of a foreign government.

(e) Subcontracts Not Affected by Waiver.—

A waiver of requirements for submission of certified cost or pricing data that is granted under section 3503(a)(3) of this title in the case of a contract or subcontract does not waive the requirement under subsection (a)(3) of this section for submission of cost or pricing data in the case of subcontracts under that contract or subcontract unless the head of the procuring activity granting the waiver determines that the requirement under subsection (a)(3) of this section should be waived in the case of those subcontracts and justifies in writing the reason for the determination.

(f) Modifications to Prior Contracts.—

On the request of a contractor that was required to submit cost or pricing data under subsection (a) in connection with a prime contract entered into on or before June 30, 2018, the head of the executive agency that entered into the contract shall modify the contract to reflect paragraphs (2)(B) and (3)(B) of subsection (a). All those modifications shall be made without requiring consideration.

(g) Adjustment of Amounts.—Effective on October 1 of each year that is divisible by 5, each amount set forth in subsection (a) shall be adjusted in accordance with section 1908.

41 U.S.C. § 3502.

28.     Further, the Government explicitly requires truth in negotiations when contracting with any branch of the U.S. Armed Forces. 10 U.S.C. § 2036a.

## VII.    Factual Allegations regarding EXPRESS False Claims

29.     MSSI and Thompson have participated in two schemes to defraud the United States Government under the EXPRESS BPA. First, they billed for work performed by individuals who do have Secret-level security clearances. Second, they misrepresented the labor wage scale of certain MSSI subcontractors and submitted false claims to the Government for reimbursement of work performed by those individuals. We describe each scheme in turn below.

### A.    *MSSI illegally billed for work performed by employees who did not have appropriate security clearances under the EXPRESS BPA.*

30.     The U.S. Department of Defense OIG has made it clear that security clearances are material in Federal contracting decisions:

> Security Clearances and Personnel Security Investigations. ***Security clearances and personnel security investigations (PSI) are key elements in protecting national security.*** A security clearance is a determination that a person is eligible under DoD policy for access to classified information. Clearances allow personnel to access classified information categorized into three levels: top secret, secret, and confidential. ***The damage to national defense and foreign relations that unauthorized disclosure could reasonably be expected to cause ranges from "exceptionally grave damage" for top secret information to "damage" for confidential information.*** A PSI is an inquiry into an individual's loyalty, character, trustworthiness, and reliability to ensure that he or she is eligible to access classified information or for an appointment to a sensitive position or position of trust. DoD uses PSIs

to determine an individual's eligibility for a security clearance. The types of PSIs vary based on the level of security clearance necessary for a given sensitive position. DoD Regulation 5200.2-R, "Personnel Security Program," January 1987, outlines criteria for sensitive positions and the corresponding clearance levels.

U.S. Dep't of Defense OIG, *DoD Security Clearance Process at Requesting Activities (D-2006-077)* at http://sgp.fas.org/othergov/dod/igclearance.pdf (Apr. 19, 2006) (emphasis added) (last visited April 7, 2022).

31.     MSSI was required to submit DD Form 254 to the Government and certify the security clearances of every contractor, subcontractor, and employee who worked on its government contracts.

32.     The DD Form 254 was submitted by the contracting officer at MSSI to the Army Contracting Command—Redstone.

33.     In its DD Form 254, MSSI falsely represented that Employee #1, Employee #2, and Employee #3 were cleared to work with Secret-level material.

34.     Employee #1, Employee #2, and Employee #3 did not, in fact, have any security clearance.

35.     MSSI could have billed Employee #1, Employee #2, and Employee #3 against its overhead budget, but instead deliberately chose to bill them against the contract. This deliberate choice was illegal and violated the terms of the EXPRESS BPAs, the FAR, and the Defense FAR Supplement. MSSI chose to commit these

violations of the False Claims Act because billing for the unqualified employees as labor, rather than overhead, was substantially more lucrative for MSSI.

36. Every contract against which MSSI billed the time of Employee #1, Employee #2, and Employee #3 is tainted by these false claims, and every invoice submitted by MSSI for these two employees is factually false based on the false certifications made by MSSI through their agents.

37. There were at least five government contracts held by MSSI during the relevant time period under the EXPRESS BPA (Contract #W31P4Q09A0011) against which these employees were unlawfully billed:

a. AH-64 Apache Logistics Task Order (W31P4Q09A0011-0004/5). This contract had a value of approximately $60 million. It ran from approximately August 2013 to August 2019.

b. CH-47 Chinook Logistics Task Order (W31P4Q09A0011-0008/9). This contract had a value of approximately $24 million. It ran from approximately February 2015 to January 2020.

c. Aviation Technical Publications Support Task Order. This contract ran from approximately September 2014 to August 2019.

d. Aviation Logistics Center Task Order (W31P4Q09A0011-0007). This contract had a value of approximately $11 million.

e. Packaging, Storage, & Containerization Center Task Order (31P4Q09A0011-0003/11). This contract had a value of approximately $3 million.

38. MSSI submitted invoices under these government contracts each month via the Defense Finance and Accounting Service (DFAS) via the wide area work flow (WAWF) electronic invoice submission portal.

39. In each submission, MSSI was required to confirm that the invoice is true and accurate with each submission. Each of these submissions were materially false and misleading to the Government.

**B. MSSI misrepresented the labor wage scale of certain employees.**

40. On June 12, 2018, the GSA released a report concerning the preaward examination of a contract extension for the AH-64 Apache Logistics Task Order (Task Order #W31P4Q09A0011-0004/5). In that report, GSA found that MSSI "overbilled the government $50,821 for subcontractor labor during the 1-year period ended December 31, 2017."

41. GSA concluded "MSSI passed through a subcontractor's billed hourly rates even though the rates exceeded MSSI's GSA schedule rates for the Sr. and Jr. Analyst categories."

42. MSSI knew long before the June 2018 audit that it should not have billed for those individuals at the unlawful, inflated rates.

43. MSSI finalized a repayment plan for this overbilling during May 2019.

44. Nevertheless, MSSI falsely represented to the Government that it had changed, or would change, its billing process to obtain a new contract award for work on the Apache AH-64 Logistics BPA.

45. In reality, MSSI continued to overbill the Government for labor in those categories.

46.     On or about October 19, 2020, Brooks directly informed Thompson that he had discovered that these illegal submissions continued well beyond the date of the 2018 GSA report and the 2019 repayment plan agreement.

47.     Brooks informed Thompson that, at that point, an additional $200,000 had been overbilled against the EXPRESS for the Apache AH-64 Logistics Task Order.

48.     Over the coming months, this issue continued to be discussed and debated within MSSI.

49.     Thompson stated that she would address it, and was the sole person capable of addressing the issue with the Government.

50.     Shortly after Thompson stated to Brooks that she was the sole person capable of addressing the issue with the Government, Brooks's employment status and conditions of employment adversely changed.

51.     On December 2, 2020, Brooks was discharged from his position as VP and COO of MSSI and SPS. Defendant Thompson alleged Brooks's termination was for cause, but in reality it was retaliation for his protected whistleblower conduct to try and stop fraud on the Government.

52.     Brooks did not receive his annual bonus, which would have been a substantial amount of compensation.

53.   Brooks was denied the severance payments in his employment agreement.

54.   Brooks was out of work for several months before he was able to obtain comparable employment at a different employer.

## VIII. Laws Governing CARES Act Paycheck Protection Program Loans

55.   The Coronavirus Aid, Relief, and Economic Security (CARES) Act was enacted on March 27, 2020, to provide emergency assistance to individuals, families, and businesses affected by the coronavirus pandemic.

56.   Section 1102(a)(2) of the CARES Act amended Section 7(a) of the Small Business Act, 15 U.S.C. § 631 *et seq.*, to establish the Paycheck Protection Program (PPP). 15 U.S.C. § 636(a)(36). Under the PPP loan program, $349 billion in forgivable loans were made available to small businesses for job retention and certain other expenses. In or around April 2020, Congress authorized more than $300 billion in additional PPP funding.

57.   The U.S. Small Business Administration (SBA) is an executive branch agency of the Government that provides support to entrepreneurs and small businesses. The mission of the SBA is to maintain and strengthen the nation's economy by enabling the establishment and viability of small businesses and by assisting in community recovery efforts after disasters. The SBA administers the

PPP to provide relief to small businesses experiencing economic hardship as a result of coronavirus measures.

58.     Individual PPP loans were issued by private, approved lenders who received and processed PPP applications and supporting documentation, and then made loans using the lenders' own funds, which were 100% guaranteed by the SBA. Data from the application, including information about the borrower, the total amount of the loan, and the listed number of employees, was transmitted by the lender to the SBA in the course of processing the loan.

59.     Under the Financial Institutions Reform, Recovery, and Enforcement Act of 1989, civil monetary penalties may be obtained by the Government for violations of Federal laws regarding lending:

(a) In general

Whoever violates any provision of law to which this section is made applicable by subsection (c) shall be subject to a civil penalty in an amount assessed by the court in a civil action under this section.

(b) Maximum amount of penalty

(1) Generally

The amount of the civil penalty shall not exceed $1,000,000.

(2) Special rule for continuing violations

In the case of a continuing violation, the amount of the civil penalty may exceed the amount described in paragraph (1) but may not exceed the lesser of $1,000,000 per day or $5,000,000.

(3) Special rule for violations creating gain or loss

(A) If any person derives pecuniary gain from the violation, or if the violation results in pecuniary loss to a person other than the violator, the amount of the civil penalty may exceed the amounts described in paragraphs (1) and (2) but may not exceed the amount of such gain or loss.

(B) As used in this paragraph, the term "person" includes the Bank Insurance Fund, the Savings Association Insurance Fund, and after the merger of such funds, the Deposit Insurance Fund, and the National Credit Union Share Insurance Fund.

(c) Violations to which penalty is applicable

This section applies to a violation of, or a conspiracy to violate—

(1) section 215, 656, 657, 1005, 1006, 1007, 1014, or 1344 of title 18;

(2) section 287, 1001, 1032,[1] 1341 or 1343 of title 18 affecting a federally insured financial institution; or

(3) section 645(a) of title 15.

(d) Effective date

This section shall apply to violations occurring on or after August 10, 1984.

(e) Attorney General to bring action

A civil action to recover a civil penalty under this section shall be commenced by the Attorney General.

(f) Burden of proof

In a civil action to recover a civil penalty under this section, the Attorney General must establish the right to recovery by a preponderance of the evidence.

(g) Administrative subpoenas

(1) In general

For the purpose of conducting a civil investigation in contemplation of a civil proceeding under this section, the Attorney General may—

(A) administer oaths and affirmations;

(B) take evidence; and

(C) by subpoena, summon witnesses and require the production of any books, papers, correspondence, memoranda, or other records which the Attorney General deems relevant or material to the inquiry. Such subpoena may require the attendance of witnesses and the production of any such records from any place in the United States at any place in the United States designated by the Attorney General.

(2) Procedures applicable

The same procedures and limitations as are provided with respect to civil investigative demands in subsections (g), (h), and (j) of section 1968 of title 18 apply with respect to a subpoena issued under this subsection. Process required by such subsections to be served upon the custodian shall be served on the Attorney General. Failure to comply with an order of the court to enforce such subpoena shall be punishable as contempt.

(3) Limitation

In the case of a subpoena for which the return date is less than 5 days after the date of service, no person shall be found in contempt for failure to comply by the return date if such person files a petition under paragraph (2) not later than 5 days after the date of service.

(h) Statute of limitations

A civil action under this section may not be commenced later than 10 years after the cause of action accrues.

12 U.S.C. § 1833a.

60.     The law further provides that misrepresentations on Small Business

Administration loan documents are actionable:

Whoever knowingly makes any false statement or report, or willfully overvalues any land, property or security, for the purpose of influencing in any way the action of . . . a Federal Reserve bank, a small business

investment company, as defined in section 103 of the Small Business Investment Act of 1958 (15 U.S.C. 662), or the Small Business Administration in connection with any provision of that Act, a Federal credit union, an insured State-chartered credit union, any institution the accounts of which are insured by the Federal Deposit Insurance Corporation, any Federal home loan bank, the Federal Housing Finance Agency, the Federal Deposit Insurance Corporation . . . upon any application, advance, discount, purchase, purchase agreement, repurchase agreement, commitment, loan, or insurance agreement or application for insurance or a guarantee, or any change or extension of any of the same, by renewal, deferment of action or otherwise, or the acceptance, release, or substitution of security therefor, shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both. . . .

18 U.S.C. § 1014.

61. Further offenses and penalties concerning the Small Business Administration are located at 15 U.S.C. section 1045(a), which states as follows:

Whoever makes any statement knowing it to be false, or whoever willfully overvalues any security, for the purpose of obtaining for himself or for any applicant any loan, or extension thereof by renewal, deferment of action, or otherwise, or the acceptance, release, or substitution of security therefor, or for the purpose of influencing in any way the action of the Administration, or for the purpose of obtaining money, property, or anything of value, under this chapter, shall be punished by a fine of not more than $5,000 or by imprisonment for not more than two years, or both.

15 U.S.C. § 1045(a).

62. False and fraudulent statements made to the Government are further addressed at 18 U.S.C. section 1001:

(a) Except as otherwise provided in this section, whoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully—

(1) falsifies, conceals, or covers up by any trick, scheme, or device a material fact;

(2) makes any materially false, fictitious, or fraudulent statement or representation; or

(3) makes or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry;

shall be fined under this title, imprisoned not more than 5 years or, if the offense involves international or domestic terrorism (as defined in section 2331), imprisoned not more than 8 years, or both. If the matter relates to an offense under chapter 109A, 109B, 110, or 117, or section 1591, then the term of imprisonment imposed under this section shall be not more than 8 years.

(b) Subsection (a) does not apply to a party to a judicial proceeding, or that party's counsel, for statements, representations, writings or documents submitted by such party or counsel to a judge or magistrate in that proceeding.

(c) With respect to any matter within the jurisdiction of the legislative branch, subsection (a) shall apply only to—

(1) administrative matters, including a claim for payment, a matter related to the procurement of property or services, personnel or employment practices, or support services, or a document required by law, rule, or regulation to be submitted to the Congress or any office or officer within the legislative branch; or

(2) any investigation or review, conducted pursuant to the authority of any committee, subcommittee, commission or office of the Congress, consistent with applicable rules of the House or Senate.

18 U.S.C. § 1001.

63. Wire fraud is specifically addressed at 18 U.S.C. section 1343, and bank fraud (because the PPP loans were obtained from Synovus Bank) is specifically addressed at 18 U.S.C. section 1344:

Whoever knowingly executes, or attempts to execute, a scheme or artifice—

(1) to defraud a financial institution; or

(2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises;

shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

18 U.S.C. § 1344.

**IX.    Factual Allegations regarding CARES Act Paycheck Protection Program Fraud by SPS, MSSI, and Thompson**

64.    To obtain a PPP loan, a qualifying business was required to submit a PPP loan application, which is signed by an authorized representative of the business. The PPP loan application required the business (through its authorized representative) to acknowledge the program rules and affirmatively certify certain facts in order to be eligible to obtain the PPP loan.

65.    In the PPP loan application, the small business (through its authorized representative) had to state, among other things, its: (a) average monthly payroll expenses; and (b) number of employees. These figures were used to calculate the amount of money the small business is eligible to receive under the PPP. In addition, businesses applying for a PPP loan were required to provide documentation showing their payroll expenses.

66.     A PPP loan application had to be processed by a participating lender. If a PPP loan application was approved, the participating lender funded the PPP loan using its own monies, which were 100% guaranteed by the SBA. Data from the application, including information about the borrower, the total amount of the loan, and the listed number of employees, was transmitted by the lender to the SBA in the course of processing the loan.

67.     Synovus Bank was a participating lender in the PPP program for processing loan applications and disbursing funds.

68.     PPP loan proceeds had to be used by the business on certain permissible expenses—payroll costs, interest on mortgages, rent, and utilities. The PPP allowed the interest and principal on the PPP loan to be entirely forgiven if the business spent the loan proceeds on these expense items within a designated period of time after receiving the proceeds and used a certain amount of the PPP loan proceeds on payroll expenses.

69.     PPP loan applicants had to certify, in part, something materially similar to the following:

> The funds will be used to retain workers and maintain payroll or make mortgage interest payments, lease payments, and utility payments, as specified under the Paycheck Protection Program Rule; I understand that if the funds are knowingly used for unauthorized purposes, the federal government may hold me legally liable, such as for charges of fraud.

70.     On or about May 1, 2020, MSSI obtained a PPP loan under PPP round 1 in the amount of $788,564. This loan was obtained from Synovus Bank and was forgiven by the SBA on or about March 2, 2021.

71.     On or about April 15, 2021, MSSI obtained a PPP loan under PPP round 2 in the amount of $788,564. This loan was obtained from Synovus Bank and has not yet been forgiven.

72.     On or about May 1, 2020, SPS obtained a PPP loan under PPP round 1 in the amount of $2,356,540. This loan was obtained from Synovus Bank and forgiven by the SBA on or about June 11, 2021.

73.     At Thompson's direction, these loan funds were used to repay lines of credit at Synovus Bank that had been frozen by the bank during the year before the loans were obtained.

74.     Those lines of credit were used by Thompson for non-business expenses, and the PPP loan funds were used for payment of debts and expenses ineligible for forgiveness under the rules established by the SBA.

## X.     Causes of Action

### Count I: Violations of 31 U.S.C. § 3729(a)(1) Concerning
### Submission of Claims for Work by Employees without Security Clearance
### *Against Defendants MSSI and Thompson*

75.     Relator incorporates and realleges the allegations of paragraphs 1-54 as if set forth fully herein.

76. Defendant MSSI by and through its agents, officers, and employees, presented or caused to be presented false or fraudulent claims for payment or approval to the United States or its fiscal intermediaries in violation of 31 U.S.C. § 3729(a)(1)(A) because MSSI falsely represented that Employee #1, Employee #2, and Employee #3 were cleared to work on Secret-level material.

77. These claims were false because Employee #1, Employee #2, and Employee #3 did not have Secret-level security clearances.

78. These claims for work performed by Employee #1, Employee #2, and Employee #3 were factually false because Defendant MSSI by and through its agents, officers, and employees, (at the direction of Defendant Thompson) certified eligibility to participate and compliance with governing Federal laws that were conditions of participation and payment.

79. These certifications were submitted by Defendant MSSI to the United States or its fiscal intermediaries on, among others, DD Form 254. Defendant MSSI further was required to certify that each Employee in question had completed a Form SF86, which is authored by the U.S. Office of Personnel Management.

80. Each employee of Defendant MSSI was required to complete a Form SF86 concerning the employee's own security clearance application, but none of the three Employees in question had submitted these forms to the Government.

81.     These false claims were presented or caused to be presented with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

82.     Defendant MSSI by and through its agents, officers, and employees, (including Defendant Thompson) made, used, and caused to be made or used, false records or statements—i.e., false statements regarding compliance with EXPRESS BPA Statement of Work § 5.0—to get false or fraudulent claims paid and approved by the United States in violation of 31 U.S.C. § 3729(a)(1)(B).

83.     The false certifications and representations of Defendant MSSI were made on each DD Form 254 and invoice submitted to the United States or its fiscal intermediaries for contracts on which Employee #1, Employee #2, and Employee #3 worked. The Defendants submitted claims the Defense Finance and Accounting Service (DFAS) via the wide area work flow (WAWF) electronic invoice submission portal and/or its equivalent to get claims paid by the United States or its fiscal intermediaries. Each such submission contained a false certification by MSSI that these Defendants and the claim were in compliance with federal regulations.

84.     The false certifications and representations made and caused to be made by Defendants MSSI and Thompson were material to the payment of the false claims as the United States conditions payment on compliance and failing to comply with those requirements makes a contractor statutorily ineligible to receive payment.

85. These false records or statements were made with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

86. Defendants Thompson and MSSI conspired with each other to knowingly present and cause to be presented false or fraudulent claims for payment to the United States or its fiscal intermediaries and conspired to knowingly make use or cause to be made or used a false record or statement material to a false or fraudulent claim in violation of 31 U.S.C. § 3729(a)(1)(C). The object of this conspiracy was to be paid money by Federal payors.

87. Defendants illegally certified that Employee #1, Employee #2, and Employee #3 had Secret-level security clearance when they did not. Defendants performed acts to effect the object of the conspiracy by arranging and referring work by Employee #1, Employee #2, and Employee #3 in exchange for payments by Federal payors. These certifications were submitted by on DD Form 254 and certified on other documents.

88. The United States has been damaged as a result of Defendants' violations of the False Claims Act in an amount to be proven at trial. The United States is entitled to this sum as reimbursement for monies obtained by the Defendants for false claims submitted to the United States.

89.     The United States is entitled to three times the total damages sustained as a result of the Defendants' violations.

90.     The United States is entitled to a civil penalty of not less than $5,500.00 and not more than $11,000.00, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 Note; Public Law 104-410) for each of Defendants' false claims.

91.     Relator is entitled to reasonable attorney's fees and costs under 31 U.S.C. § 3730(d)(1).

**Count II: Violations of 31 U.S.C. § 3729(a)(1) Concerning
MSSI Submission of Claims for Payment for Work Performed by Employees
Whose Billed Rates Exceeded the Allowable Rates
*Against Defendants MSSI and Thompson***

92.     Relator incorporates and realleges the allegations of paragraphs 1-54 as if set forth fully herein.

93.     Defendants MSSI and Thompson by and through their agents, officers, and employees, presented or caused to be presented false or fraudulent claims for payment or approval to the United States or its fiscal intermediaries in violation of 31 U.S.C. § 3729(a)(1)(A) for subcontractors of MSSI who were billed at rates higher than those allowed under the contracts and Federal regulations.

94.     These claims were false because the subcontractors in question were billed at rates that were too high for them based on their skill and the tasks performed.

95.     On June 12, 2018, the GSA released a report concerning the preaward examination of a contract extension for the AH-64 Apache Logistics Task Order (Task Order #W31P4Q09A0011-0004/5). In that report, GSA found that MSSI "overbilled the government $50,821 for subcontractor labor during the 1-year period ended December 31, 2017."

96.     Defendants MSSI and Thompson, through their employees, agents, or intermediaries represented the Government that they would correct the error going forward and they would bill at the appropriate rates.

97. Defendants MSSI and Thompson possessed actual knowledge of the falsity of their representations regarding the employee billing rates, or with reckless disregard or deliberate ignorance of whether or not they were false. MSSI knew long before June 2018 that it should not have billed for those individuals at the artificially inflated rates.

98. Defendant MSSI continued to bill the same employees for further work under the Apache AH-64 Logistics Task Order using the overcharging rates, just as it had before the 2018 audit and its 2019 settlement and payment plan.

99. The United States has been damaged as a result of Defendants' violations of the False Claims Act in an amount to be proven at trial. The United States is entitled to this sum as reimbursement for monies obtained by the Defendants for false claims submitted to the United States.

100. The United States is entitled to three times the total damages sustained as a result of the Defendants' violations.

101. The United States is entitled to a civil penalty of not less than $5,500.00 and not more than $11,000.00, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 Note; Public Law 104-410) for each of Defendants' claims made under the contract because of the misrepresentation.

102. Relator is entitled to reasonable attorney's fees and costs under 31 U.S.C. § 3730(d)(1).

## Count III: Violations of 31 U.S.C. § 3729(a)(1)
### Concerning PPP Loan Fraud
#### *Against Defendants MSSI, SPS, and Thompson*

103. Relator incorporates and realleges the allegations of paragraphs 1-19 and 55-74 as if set forth fully herein.

104. Defendants MSSI, SPS, and Thompson by and through their agents, officers, and employees, presented or caused to be presented false or fraudulent claims for payment or approval to fiscal intermediaries of the United States in violation of 31 U.S.C. § 3729(a)(1)(A) for PPP loans obtained based on false statements and PPP loan forgiveness obtained based on false statements.

105. On or about May 1, 2020, MSSI obtained a PPP loan under PPP round 1 in the amount of $788,564. This loan was obtained from Synovus Bank and was forgiven by the SBA on or about March 2, 2021.

106. On or about April 15, 2021, MSSI obtained a PPP loan under PPP round 2 in the amount of $788,564. This loan was obtained from Synovus Bank and has not yet been forgiven.

107. On or about May 1, 2020, SPS obtained a PPP loan under PPP round 1 in the amount of $2,356,540. This loan was obtained from Synovus Bank and forgiven by the SBA on or about June 11, 2021.

108. Thompson signed or authorized the signing of materially false PPP applications for SPS and MSSI to obtain those loans and forgiveness.

109.   The loan applications contained acknowledgements of the PPP program rules and made certain affirmative certifications to be eligible.

110.   The loan applications in question were processed by Synovus Bank, a participating lender.

111.   Synovus Bank funded the PPP loans in question using its own monies, which were guaranteed by the SBA.

112.   Data from the applications was presented by Synovus Bank to the SBA in the course of processing the loan.

113.   The PPP loan proceeds in question were not used for permissible expenses, and they should not have been forgiven based on their uses.

114.   At Thompson's direction, these loans were used to repay lines of credit at Synovus Bank that the bank had frozen before the loans were obtained.

115.   Those lines of credit were used by Thompson for non-business expenses, and the PPP loan funds were used for payment of debts and expenses ineligible for forgiveness under the rules established by the SBA.

116.   Defendants SPS, MSSI, and Thompson possessed actual knowledge of the falsity of their representations on their loan applications and applications for loan forgiveness, or acted with reckless disregard or deliberate ignorance of whether or not they were false.

117. The United States has been damaged as a result of Defendants' violations of the False Claims Act in an amount to be proven at trial. The United States is entitled to this sum as reimbursement for monies obtained by the Defendants for false claims submitted to the United States.

118. The United States is entitled to three times the total damages sustained as a result of the Defendants' violations.

119. The United States is entitled to a civil penalty of not less than $5,500.00 and not more than $11,000.00, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 Note; Public Law 104-410) for each of Defendants' claims made under the contract because of the misrepresentation.

120. Relator is entitled to reasonable attorney's fees and costs under 31 U.S.C. § 3730(d)(1).

### Count IV: Violations of 31 U.S.C. § 3730(h)
### For Violation of the Whistleblower Protections of the False Claims Act
### *Against SPS, MSSI, and Thompson*

121. Relator incorporates and realleges paragraphs 1-23, 25-29, 40-54, and 92-102 as if set forth fully herein.

122. Defendants SPS, MSSI, and Thompson demoted, discharged, and otherwise discriminated against Brooks in the terms and conditions of his employment, because of the lawful acts done by Brooks in furtherance of his efforts to stop one or more violations of the False Claims Act by Defendants.

123.    Under the False Claims Act, Brooks is entitled to reinstatement with the same seniority status that he would have had but for the discrimination, two times the amount of back pay, interest on back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorney's fees.

## XI.    Prayer for Relief and Jury Demand

Relator prays this Court order the following judgment and relief:

(a)    Ordering the Defendants to pay the United States Government three times its actual damages resulting from the Defendants' violations of the False Claims Act;

(b)    Ordering Defendants to pay the United States Government a civil penalty for each false claim as set forth in the False Claims Act;

(c)    Ordering Defendants to pay Relator monetary damages for their violations of 31 U.S.C. §3730 (h), the Whistleblower Protections of the False Claims Act;

(d)    Awarding Relator an amount this Court decides is reasonable for collecting the civil penalty and monetary damages by pursuing this matter, which award, by statute shall not be less than 15% nor more than 25% of the proceeds of this action or the settlement of any such claim, if the Government intervenes in the

action and not less than 25% nor more than 30% if the Government declines to intervene in the action;

(e)     Ordering the Defendants to pay Relator's attorneys' fees and costs; and

(f)     Granting such other relief as the Court may deem just and proper.

**Relator demands a trial by a struck jury.**

Respectfully submitted,

Robert E. Battle (ASB-7807-T67R)
Adam P. Plant (ASB-6324-A64P)
**BATTLE & WINN LLP**
2901 Second Avenue South, Suite 220
Birmingham, Alabama 35233
Tel: (205) 397-8160
Fax: (205) 397-8179

*Attorneys for Relator John Brooks*

## CERTIFICATE OF SERVICE

I hereby certify that on May 9, 2022 I hand-filed filed the foregoing with the Clerk of the Court in person. Relator will serve only the following during the pendency of the seal of this matter, as required by 31 U.S.C. § 3170(b)(2), in accordance with Federal Rule of Civil Procedure 4(*i*):

> Merrick B. Garland
> Attorney General of the United States
> Department of Justice
> 10th & Constitution Aves. N.E.
> Washington, DC 20530
>
> Prim F. Escalona
> United States Attorney
> Northern District of Alabama
> 1801 4th Avenue North
> Birmingham, Alabama 35203

This Complaint has been filed in camera, shall remain under seal for at least 60 days, and shall not be served on the Defendants until the court so orders.

*Attorney for Relator*